Filed 6/24/21 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JAMELL TOUSANT,<br><br>      Defendant and Appellant. | A156044<br><br>(Alameda County<br>Super. Ct. No. 178808)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the partially published opinion filed on May 26, 2021, be modified as follows:

On page 8, in the first full paragraph, sixth sentence, change "Officer Fuentes, who arrived on the scene, believed the car was connected to the shooting," to "**Officer Fuentes and Sergeant Royal arrived at the scene, and Sergeant Royal believed the car was connected to the shooting.**"

On page 10, in the first full paragraph, in the first to the last sentence change, "Shell casings and a loaded firearm magazine were located on the street a few feet from the car" to "**A loaded firearm magazine was located on the scene, and shell casings were on the street a few feet from the car.**"

In the paragraph beginning at the bottom of page 10 that begins with the sentence, "These circumstances—" change the phrase within that

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III through VIII of the Discussion.

1

sentence at the top of page 11 from "its unfamiliarity to nearby residents," to "**its unfamiliarity to a nearby resident**."

On page 15, first paragraph, in the sentence beginning, "By turning the cellphone on," change the words "viewing a photo" to "**viewing a few photos**."

On page 39, in the paragraph that begins at the bottom of page 38, in the sentence that begins, "And although specific intent to target a person is not required," change the words from "10 to 15 shots were fired directly at one of the men" to "**5 to 10 shots were fired directly at one of the men.**"

There is no change in the judgment.

Appellant's petition for rehearing is denied.


Dated: _____                    _____
                                                        Kline, P.J.

Trial Court:Alameda County Superior Court

Trial Judge:        Hon. Kevin R. Murphy

Counsel:

James S. Donnelly-Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share, Leif M. Dautch and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

Filed 5/26/21 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMELL TOUSANT,<br><br>        Defendant and Appellant. | A156044<br><br>(Alameda County<br>Super. Ct. No. 178808) |

A jury convicted defendant Jamell Tousant of numerous counts related to a shooting targeting several individuals in a residential area of Berkeley and to his possession of firearms. On appeal, Tousant primarily challenges the denial of his motion to suppress evidence downloaded from his cellphone, seized after an allegedly illegal search of his car left at the scene of an Oakland shooting. He also identifies several purportedly erroneous rulings, including the admission of incriminating statements to a police officer, admission of uncharged acts, denial of a motion to sever, and an improper response to a jury question. There was no error in these rulings. We also reject Tousant's claim the evidence supporting three assault convictions was insufficient and affirm.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III through VIII of the Discussion.

## BACKGROUND

In January 2016, the Alameda County District Attorney filed an eight-count information, charging Tousant for crimes related to an August 15, 2015 shooting. This included four counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2)[1] (counts 1-4)); two counts of shooting at an inhabited dwelling (§ 246 (counts 5-6)); one count of shooting at an unoccupied vehicle (§ 247, subd. (b) (count 7)); and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1) (count 8)). The information further alleged an enhancement for personal use of a firearm and causing great bodily injury for the assault and shooting of the dwelling (§§ 12022, 12022.5, subd. (a), 12022.7, 12022.53).

In July 2016, an additional three-count information was filed related to an August 31, 2015 traffic stop, alleging Tousant was a felon carrying a concealed, loaded, and unregistered firearm in a vehicle (§ 25400, subds. (a)(1), (c)(1), (c)(6) (count 9)); carrying a loaded, unregistered firearm on his person in a city (§ 25850, subds. (a), (c)(1), (c)(6) (count 10)); and possessing a firearm (§ 29800, subd. (a)(1) (count 11)). The two cases were later consolidated. The evidence below was revealed at a 2018 jury trial.

### I.

### *Murder of Tousant's Son*

In April 2015, Tousant's son, Tousant Jr., was shot and killed as the result of possible gang violence. To prevent retaliatory shootings, undercover police surveilled the hospital where Tousant Jr. was brought for treatment but ultimately died. One officer witnessed Tousant standing outside the hospital, holding a long-barreled shotgun and an ammunition belt with

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

shotgun rounds.  Tousant was upset and agitated, at one point loudly stating, "Fuck that.  Fuck the police."

Oakland Sergeant Leonel G. Sanchez, who was investigating Tousant Jr.'s murder, later sought information from Tousant.  Sanchez asked Tousant to contact him if he discovered or received any helpful information, cautioned Tousant to not take matters "into his own hands," and urged him allow the Oakland Police Department to investigate his son's death.  Aside from expressing his belief Tousant Jr.'s death may have been related to a dice game, Tousant did not provide Sanchez any information at that time.

Tousant nonetheless undertook his own investigation.  He believed his son had a feud with the Five Finga Mafia, a gang in Berkeley.  Tousant Jr.'s friends confirmed the Five Finga Mafia threatened them after they took a chain and a watch from the gang's members.  Tousant searched for information about Five Finga Mafia, eventually identifying people associated with them.  Members of the Five Finga Mafia included Nigel Blackwell and Kevin Greene.  Tousant later came to believe that Nigel Blackwell killed his son.

## II.

### *Berkeley Shooting*

The evening of August 15, 2015, Jocko Milan, Rashad Jacob,[2] David Conerly and Kevin Greene were standing outside 2806 Mabel Street, a house in Berkeley across the street from San Pablo Park.  At approximately 6:30 p.m., a white, four-door vehicle pulled up in front of the house.  From the car window, the passenger fired 10 to 15 shots from a long-barreled gun

---

[2] There is a discrepancy in the record regarding the spelling of Rashad Jacob's name.  We adopt the spelling of his name used in the information and medical records, "Rashad Jacob."

towards the house where the four men congregated. Greene and Jacob ran away and jumped over a fence. Jacob was shot in the leg. One of the men ran out of the house's front yard and continued down the street. The driver got out of the white vehicle and fired approximately 5 to 10 shots from a handgun at the fleeing man, who eventually hid behind another car. The driver then got back into the car and drove away. At that point, Conerly jumped into a friend's car and drove away.

In another car, a witness who was waiting at a traffic light nearby heard the gunshots. That witness soon noticed the white, four-door vehicle pull up beside his car, drive on the wrong side of the road, and slowly drive through the red light. This witness wrote down the license plate number, 6AAY078, which was later determined to be the license plate for Tousant's car.

Police recovered 10 bullet casings from the scene of the shooting—seven 7.62 by 39-caliber casings, and three .45-caliber casings. Records confirmed that Tousant's cellphone was near San Pablo Park at both 6:17 p.m. and 6:27 p.m. the day of the shooting. Shortly after the shooting, Tousant and his girlfriend, Hillary Yamitch, exchanged a series of messages. In one, Tousant texted, "I'm Hot[.] Did something trying to see if the police come over." Yamitch responded, "[W]hat? I thought you said you weren't going to do anything." Tousant denied taking any actions, but again asked Yamitch whether police were at their house. Tousant stated, "I can't worry about justice for my son & worry about your feelings to [sic] I tryed [sic]. But for once I'm going to take my son [sic] side."

### III.

### *Uncharged Oakland Shooting*

At approximately 4:30 a.m. on August 20, 2015, Bruce McMahan backed his car out of the driveway from his house at 1312 105th Avenue in Oakland—a driveway shared with his neighbors living at 1314 105th Avenue. Someone then jumped out from behind a car on the street and started shooting at him. Several bullets pierced through McMahan's car but did not injure him. He panicked and quickly reversed his car. While backing up, McMahan saw another man directly across the street. The shooter and the man standing across the street then got into a white four-door vehicle and drove away.

From the scene of this shooting, police recovered 14 9-millimeter shell casings, a loaded semiautomatic handgun magazine, and two unfired 7.62 by 39-millimeter bullets. They also found Tousant's red Chevrolet Camaro rental car parked across the street from McMahan's house, blocking a resident's driveway, and only a few feet from the shell casings. Police searched the car and recovered, among other things, the rental agreement for the car and Tousant's cellphone.

One of Tousant's contacts had sent him a message with the address 1314 105th Avenue—the address of the Oakland shooting. The contact, at Tousant's request, had confirmed the address belonged to "Nigel." After reviewing the internet search history on Tousant's cellphone, the police determined Tousant had looked up the 1314 105th Avenue address at 10:57 p.m. on August 19, five hours before the Oakland shooting occurred. In one text message sent two days before the shooting, Tousant stated, "Brah, it's serious" and "Bring my gun. I'm on 9 Ave."

5

## IV.

### *August 31, 2015 Traffic Stop*

On August 31, 2015, Tousant and two other people were sitting in his parked Chevrolet Impala while in Oakland. An Oakland police officer checked the license plate number, 6AAY078, and confirmed Berkeley police were seeking the car in relation to an unspecified violent crime. The officer then performed a traffic stop of Tousant's car, detained Tousant and the other passengers, and informed Berkeley police about the stop. The Berkeley police arrived and searched the car, yielding a loaded 9-millimeter handgun and a 7.62 by 39-caliber shell casing, the same caliber bullet as one of the guns used in the Berkeley shooting.

## V.

### *Defense Case*

Tousant testified that when his son was killed on April 28, 2015, he stood outside the hospital with a shotgun and ammunition because he wanted to protect other members of his family from possible gang violence. He acknowledged meeting with Sanchez, agreed to help with the police investigation, and started gathering information about possible suspects and motives relevant to his son's killing. While he admitted researching the Five Finga Mafia and Kevin Greene, he disavowed any knowledge of Greene's residence.

Tousant admitted he was near San Pablo Park on August 15, 2015, the day of the Berkeley shooting, but claimed he was visiting his girlfriend. Upon hearing the gunshots, he left the area and drove to Oakland. At the time, he was using his Camaro rather than his Impala. He had lent the Impala to a man named "Fresh." Later that night, Tousant discovered his Impala had been involved in the Berkeley shooting. He texted Yamitch

6

because he feared the car would connect him to the Berkeley shooting. He further explained that when he texted "Did something," he was referring to lending his Impala to Fresh.

Tousant also acknowledged that he was at the scene of the Oakland shooting—where he believed Nigel Blackwell lived—on August 20, 2015. He arrived at approximately 3:00 a.m., parked his Camaro across the street, stayed there for approximately one hour before he walked around the block to look for Nigel Blackwell's car. When he later heard gunshots, Tousant fled on foot, leaving his Camaro because he "didn't want to deal with it."

## VI.

### *Verdict and Sentencing*

The jury convicted Tousant of all counts but found the personal-use firearm allegations not true. The trial court imposed a sentence of 22 years in state prison. This timely appeal followed.

## DISCUSSION

## I.

### *The Trial Court Properly Rejected Tousant's Motion to Suppress Evidence Obtained from His Car and Cellphone.*

Tousant claims the trial court erroneously denied his motion to suppress evidence obtained after the Oakland shooting and in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. (U.S. Const., 4th Amend.) After assessing each aspect of the search and seizure, we disagree.

#### A. Standard of Review

A warrantless search is presumptively unreasonable unless it falls within a " 'specifically established and well-delineated' " exception to the warrant requirement. (*People v. Lopez* (2019) 8 Cal.5th 353, 359; U.S. Const., 4th Amend.) "Evidence obtained from a search or seizure in violation of the

Fourth Amendment must be excluded from use at a criminal trial only if required by federal law." (*People v. Barnes* (2013) 216 Cal.App.4th 1508, 1513.) A defendant may move to suppress evidence obtained without a warrant as unreasonable. (§ 1538.5, subd. (a)(1)(A).) The prosecution must demonstrate a legal justification for the search. (*People v. Evans* (2011) 200 Cal.App.4th 735, 742.) When reviewing a ruling on a suppression motion, we consider the record in the light most favorable to the trial court's decision and defer to its factual findings if supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673-674.) We independently review whether the search or seizure was reasonable. (*Ibid.*)

**B. The Relevant Facts and Proceedings Below**

Police engaged in a warrantless search of Tousant's Camaro rental car a few hours after the Oakland shooting. The car was parked directly across the street from McMahan's house. The resident who lived across the street from McMahan informed Oakland police that the car was not there when he left for work at approximately 2:00 a.m. When he returned home at approximately 5:00 a.m., he found the car partially blocking his driveway. He did not recognize the car, and no one came to retrieve it after the shooting. Officer Fuentes, who arrived on the scene, believed the car was connected to the shooting. The doors to the car were unlocked and the keys were in the ignition. A police technician entered the car, and once inside, saw a cellphone and some clothing and found a rental agreement bearing Tousant's name in the car's center console. The officer collected these items and took them to the police department.

On September 2, Officer Lorena Arreola, who had been investigating Tousant and his potential involvement in the Oakland shooting, turned on the seized cellphone to identify its phone number. She retrieved the number

by looking through the settings folder on the phone. She also found a photograph of Tousant's driver's license on the phone. A computer program used for identifying phone subscribers by their telephone numbers indicated the cellphone belonged to Tousant. Arreola then used this cellphone number and other details of her investigation of Tousant to write an affidavit in support of a search warrant of the cellphone. A warrant issued on September 4, and Arreola downloaded the cellphone's contents, including Tousant's photos, internet search history and the text messages between Tousant, Yamitch, and other contacts.

At a preliminary hearing before a magistrate, Tousant moved to quash the warrant and suppress this evidence (§ 1538.5). The magistrate held that Tousant had standing to challenge the search of the car, finding he did not abandon it. But the magistrate summarily denied the suppression motion. Tousant's trial counsel renewed the motion to suppress (§ 1538.5, subd. (i)). Like the magistrate, the trial court found Tousant did not abandon the car but denied the motion.

### C. The Search of Tousant's Car Was Justified.

Tousant contends there was no probable cause to search his Camaro without a warrant. We find the search and seizure justified under the automobile exception to the warrant requirement.

That exception authorizes law enforcement to conduct a warrantless search of any area of a vehicle if there is probable cause to believe it contains evidence of criminal activity or contraband. (*People v. Lopez, supra,* 8 Cal.5th at p. 372; *U.S. v Ross* (1982) 456 U.S. 798, 799-800.) "Probable cause to search exists when, based upon the totality of the circumstances . . . 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" (*People v. Farley* (2009) 46 Cal.4th 1053, 1098 (*Farley*); *Illinois v. Gates* (1983) 462 U.S. 213, 230-239.) The automobile exception is

9

rooted in the differences between vehicles and dwellings—vehicles are mobile, creating a risk evidence may be moved or lost while officers seek out a search warrant. (*California v. Acevedo* (1985) 500 U.S. 565, 569.) The rationale for this exception evolved, recognizing there is a lesser expectation of privacy in a vehicle than a dwelling. (*California v. Carney* (1985) 471 U.S. 386, 391.) Decisions upholding warrantless searches of vehicles thus do not distinguish between searches conducted on parked vehicles or vehicles that have been stopped by police on a highway. (*People v. Superior Court (Overland)* (1988) 203 Cal.App.3d 1114, 1119.)

Here, law enforcement could reasonably conclude the Camaro was connected to the shooting and could contain evidence relevant to the crime. (Cf. *People v. Superior Court* (*Hampton*) (1968) 264 Cal.App.2d 794, 798 [search of vehicle reasonable where witness identified car as belonging to potential suspect of burglary, even though intruder fled on foot].) The trial court found the car was parked in a haphazard way, partially blocking a resident's driveway and directly across the narrow street from where McMahan's truck was shot. It was there when Officer Fuentes arrived shortly after 4:30 a.m. The resident informed Fuentes that he did not recognize the car and it had not been parked there at approximately 2:00 a.m. when he left for work. The officer conducted a record check of the license plate and discovered it was a rental car. The doors were unlocked, and the keys were in the ignition, suggesting that the driver left the car quickly. Shell casings and a loaded firearm magazine were located on the street a few feet from the car. Across the street from the Camaro was a vehicle riddled with bullet holes that had crashed into two parked cars.

These circumstances—the Camaro's proximity to the target of the shooting, bullet casings, and loaded magazine, its arrival on the scene shortly

before the shooting, its unfamiliarity to nearby residents, and the indications it was a rental car, which the driver hastily parked and fled—in their totality established "a fair probability" that the vehicle and its occupants were connected to the shooting and that the car would contain evidence of that crime. (See *Farley*, *supra*, 46 Cal.4th at p. 1098.) We agree with the magistrate that there was probable cause to search the Camaro.

Tousant disputes this conclusion by narrowly examining the individual circumstances one by one, arguing none of them alone establishes probable cause. For instance, he claims the Camaro's proximity to the shooting and bullet casings does not itself establish probable cause for an automobile search. He further contends the red Camaro is unconnected to the Oakland shooting because it does not match the description of the suspect's vehicle— an older, white four-door sedan. This analysis is flawed. The relevant inquiry is whether the *totality of the circumstances* would lead a person of "ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched." (*People v. Dumas* (1973) 9 Cal.3d 871, 885.) Here, as we have said, based on all of the facts known to them at the time, the police could reasonably believe the Camaro was connected to and would yield evidence of the crime.

Because we conclude there was probable cause to search the Camaro, we need not address the People's additional arguments that Tousant abandoned the car and therefore lacked standing to challenge the search. We also do not address their claim that the smell of unburnt marijuana justified the search of the car.

11

**D. There Was Probable Cause to Seize Tousant's Cellphone.**

For similar reasons, the police properly seized Tousant's cellphone[3]—found in plain view, in "the clearly visible portion of the center console near the left-hand side of the center console cup holder, close to the right edge of the driver's seat." We are unconvinced by Tousant's arguments that seizure of the cellphone was unjustified because cellphones are not inherently illegal items, the cellphone lacked any nexus with suspected criminal activity, and law enforcement unduly delayed obtaining a search warrant to search the contents of the cellphone after it was seized.

Like searches, seizures must be reasonable on the facts presented. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119.) Officers may seize evidence in plain view "from a position where the officer has a right to be," including a vehicle he or she is entitled to search. (*People v. Webster* (1991) 54 Cal.3d 411, 431.) "In the cell phone context . . . it is reasonable to expect that incriminating information will be found on a phone regardless of when the crime occurred." (*Riley v. California* (2014) 573 U.S. 373, 388, 399 (*Riley*) [defense concession that officers can seize and secure cell phones discovered during proper searches of a defendant's person incident to arrest is "sensible"].) Here, police reasonably believed the Camaro and its driver were connected to the shooting. Based on the totality of the circumstances we have

---

[3] Tousant also challenges the search and seizure of additional items from his car, including a rental agreement, cigarette butt, and an interim driver's license, but he fails to advance any arguments specifically addressing those items in his opening brief. He thus fails to meet his burden on appeal demonstrating error. (See *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 [" ' "We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate error—it will not be presumed" ' "].)

already discussed, there was probable cause to believe the cellphone would contain evidence related to the shooting, and therefore it was properly seized.

Nor was law enforcement's 15-day retention of Tousant's cellphone before securing a warrant to search its contents unreasonable, an argument Tousant raises for the first time on appeal. Seizures, which affect a person's possessory interest in an item, are less intrusive than searches, which implicate a person's privacy interests. (*Segura v. U.S.* (1984) 468 U.S. 796, 806, 812; *People v. Tran* (2019) 42 Cal.App.5th 1, 8.) The interest in protecting "incriminating evidence from removal or destruction can supersede, at least for a limited period, a person's possessory interest in property, provided that there is probable cause to believe that that property is associated with criminal activity." (*Segura*, at p. 808.)

The record does not support Tousant's claim he had an "undiminished possessory interest" in his cellphone that was affected by the delay in securing a search warrant. Tousant does not claim he requested the return of the cellphone. Nor does he cite any evidence below that he ever sought return of the cellphone. (*U.S. v. Johns* (1985) 469 U.S. 478, 487 [delay in obtaining a warrant did not adversely affect possessory interests where defendant did not seek return of property and failed to allege or prove the delay "adversely affected legitimate interests protected by the Fourth Amendment"].)[4]

---

[4] At trial, Tousant testified that he did not retrieve the car because he "didn't want to deal with it." The People also offered evidence at trial indicating Tousant began storing data on a different phone on August 20, 2015, the date policed seized the cellphone from the Camaro. The People argue this evidence shows Tousant had no intention of retrieving the seized cellphone. We need not rely on this evidence, which was elicited well after the magistrate and trial court had denied the motions to suppress.

The police, on the other hand, had a substantial interest in extracting data from the cellphone. Based on the evidence gathered at the scene of the Oakland shooting and subsequent investigations, which we discuss further below, Officer Arreola believed Tousant was involved, and the cellphone would contain evidence relevant to that event. Given the lack of any showing by Tousant that his possessory interests were affected by the two-week delay in searching the contents of cellphone retrieved from the Camaro, Tousant does not demonstrate the length of the seizure was unreasonable.

**E. The Search Warrant for Tousant's Cellphone Was Valid.**

Tousant contends Arreola's limited September 2 warrantless search of Tousant's cellphone to identify its corresponding telephone number was illegal. According to Tousant, without this information confirming his ownership of the cellphone, there was no probable cause to believe the phone contained any evidence of the Oakland shooting. Thus, he argues there was no basis to issue a warrant to search the phone, and in any event, the resulting warrant was overbroad.[5]

When determining whether probable cause existed for the issuance of a search warrant, we assess the totality of the circumstances under which the warrant issued. (*Illinois v. Gates* (1983) 462 U.S. 213, 230-235; § 1525 ["A search warrant cannot be issued but upon probable cause, supported by affidavit"].) Doubts as to whether an affidavit supporting a search warrant establishes probable cause are resolved in favor of the validity of the warrant. (*People v. Frank* (1985) 38 Cal.3d 711, 722.)

---

[5] We do not address Tousant's challenge to the scope of information sought by the warrant to search Tousant's cellphone, an argument he failed to raise in the trial court and thus forfeits on appeal. (See *People v. Tully* (2012) 54 Cal. 4th 952, 979-980 [specific claim not raised in defendant's suppression motion in the trial court is forfeited on appeal].)

As a threshold matter, the People concede, and we agree, that Arreola's initial pre-warrant search of Tousant's cellphone on September 2, 2015, was illegal. The U.S. Supreme Court in *Riley*, *supra*, 573 U.S. 373, concluded officers may not engage in a warrantless search of "those areas of the phone where an officer reasonably believes that information relevant to . . . the arrestee's identity" may be discovered. (*Id.* at p. 399 [addressing limited search of a cellphone seized incident to arrest].) Instead, absent an emergency, a warrant is required to search the digital contents of a cellphone. (*Id*. at p. 401.) By turning the cellphone on, using guesswork to determine its password, unlocking it, looking through the settings folder and viewing a photo, Arreola violated Tousant's Fourth Amendment rights. Thus, the information she gleaned from this limited search of Tousant's cellphone—the telephone number and photograph of his driver's license—must be excised from the affidavit supporting the search warrant to view the digital contents of the phone. (*People v. Weiss* (1999) 20 Cal.4th 1073, 1081 (*Weiss*).)

Where, as here, "a criminal investigation involved some illegal conduct, courts will admit evidence derived from an 'independent source' "—evidence " 'that has been discovered by means wholly independent of any constitutional violation.' " (*Weiss*, *supra*, 20 Cal.4th at p. 1077.) For search warrant affidavits containing "both information obtained by unlawful conduct as well as untainted information, a two prong-test applies to justify application of the independent source doctrine." (*People v. Robinson* (2012) 208 Cal.App.4th 232, 241.) "First, the affidavit, *excised of any illegally-obtained information*, must be sufficient to establish probable cause." (*Ibid*.) Second, the evidence must support a finding that 'the police subjectively would have sought the warrant even without the illegal conduct.' " (*Ibid*.) "[W]e determine de novo whether the search warrant affidavit is sufficient to

15

establish probable cause . . . absent the information obtained by the illegal [conduct]." (*Ibid.*)

Even without the tainted information derived from the illegal search— the cellphone number and driver's license information confirming Tousant's connection with the cellphone—Arreola's affidavit established probable cause to search the cellphone. (See *Weiss, supra*, 20 Cal.4th at p. 1081.) Most of the affidavit detailed Arreola's investigation of Tousant *before* the September 2 warrantless search of his phone. Arreola tied Tousant to the Oakland shooting because his rental car, the Camaro, was found at the scene of the shooting with his rental agreement inside it. The affidavit pointed out that the cellphone was recovered from the Camaro. Arreola chronicled Tousant's history of law enforcement contacts, including prior felony convictions for robbery and failure to register as a sex offender, his son's death from a shooting, his presence at the hospital holding a loaded black shotgun in apparent violation of laws prohibiting felons from possessing firearms and ammunition, and his involvement in a shooting in July 2015 in which he was shot in the leg. She described Tousant's arrest on August 31, 2015, after police found him sitting in the Chevrolet Impala, the vehicle used by the suspect in the Berkeley shooting. Items found in the Impala during that arrest further linked Tousant with the two shootings. These included a 7.62 by 39-caliber bullet casing of the same type and size as those found at the Berkeley and Oakland shootings and a loaded 9-millimeter Ruger in the purse of a female passenger (Street) in the vehicle. She pointed out that a 9-millimeter handgun was also used at the Oakland shooting. Arreola reported the passenger denied knowledge of the 9-millimeter gun and stated that Tousant had handed the gun to her to place inside her purse and, after they

16

were arrested, had urged her to "take it" saying it would only be a misdemeanor, and promised to bail her out.

Tousant insists the information Arreola obtained from the illegal September 2 search of his phone was essential to the issuance of the warrant. Pointing to the fact the cellphone was found next to an interim driver's license belonging to another individual, Tousant claims there was no evidence the phone was his. Tousant ignores the facts that the cellphone was recovered from the Camaro on the driver's side of the car and that a rental agreement in his name was also found. These circumstances made it reasonable to infer the cellphone belonged to Tousant. Probable cause requires only a fair probability, not a certainty. (*Farley*, *supra*, 46 Cal.4th at p. 1098.)

The location of Tousant's arrest after he was found driving the same Chevrolet Impala as that involved in the Berkeley shooting, the presence of his rental Camaro unlocked and with keys in the ignition at the scene of the Oakland shooting, the ballistics evidence potentially connecting him with both shootings, and his history of involvement with guns and shootings established probable cause that Tousant was involved in both shootings. And there was a nexus between the shootings and the cellphone. Arreola explained that based on her experience working in a felony assault unit, perpetrators often use their phones to communicate plans for assault, to retain photos of themselves with weapons, and to brag about completed assaults. (See *Riley*, *supra*, 573 U.S. at p. 399; see, e.g., *People v. Price* (2017) 8 Cal.App.5th 409, 427, 431 [murder case in which text messages strongly implicated defendant as shooter and evinced intent to kill]; *In re K.B.* (2015) 238 Cal.App.4th 989, 994 [incriminating photos extracted from cellphone showed juveniles posing with handguns]; *People v. Hollinquest* (2010)

17

190 Cal.App.4th 1534, 1544 [incriminating cellphone evidence linked co-defendants to each other and to victim by multiple calls on day of murder and placed them in close proximity to each other and to scene of murder].)

Testimony further established Arreola would have sought the warrant even without the tainted cellphone information. (See *Weiss*, *supra*, 20 Cal.4th at p. 1079.) Before she searched the cellphone, she confirmed Tousant's identity and listed him as a suspect for the Oakland shooting based on the information set forth above. The trial court found the officer's September 2 cellphone search did not negate her investigation efforts. (See *Murray v. U.S.* (1988) 487 U.S. 533, 542 [warrant fails independent source rule if the illegally obtained information prompted the agent's decision to seek the warrant or affected the magistrate's decision to issue the warrant].) The facts amply support the trial court's finding that the police would have sought and obtained the warrant even without obtaining Tousant's telephone number or driver's license information.[6] (See *id*. at pp. 543-544 [remand required where trial court makes no finding about whether illegal conduct was irrelevant to later securing warrant].)

Both prongs of the independent source doctrine were satisfied here, and there was no error in the trial court's ruling on Tousant's suppression motion.[7]

---

[6] Given this conclusion, it is unnecessary to address Tousant's additional argument that the information downloaded from the cellphone would not have been inevitably discovered. Contrary to Tousant's assertions, the trial court expressly stated it was not relying on the inevitable discovery rule to deny Tousant's suppression motion.

[7] In light of our conclusion, we do not address Tousant's prejudicial error argument.

18

## II.

### *Tousant Did Not Require* Miranda *Warnings Because He Was Not Interrogated.*

Tousant contends the trial court erroneously admitted self-incriminating statements made to Sergeant Sanchez during a custodial interrogation about his son's murder investigation, and without receiving advisements required under *Miranda v. Arizona* 384 U.S. 436 (*Miranda*). There was no error.

### A. The Relevant Facts and Proceedings Below

Tousant was arrested after the August 31, 2015 traffic stop, and officers transported him to the Berkeley Police Department for questioning. Berkeley officers advised him of his *Miranda* rights, Tousant stated he understood, and he continued to participate in a conversation with them. On September 1, 2015, Sanchez learned Tousant was in custody for firearms charges arising from the traffic stop. He had no knowledge that Berkeley police were investigating Tousant for the Berkeley shooting. Instead, Sanchez was interested in information Tousant had about his son's murder. On that basis, he obtained a removal order for Tousant, transported him to Oakland, and interviewed him in an interrogation room. Sanchez did not read Tousant his *Miranda* rights, did not ask Tousant about the Berkeley shooting and did not ask him about any other shootings he might have committed in the past.

During a recorded conversation, Tousant described his son's involvement in a Berkeley gang called "Waterfront." Waterfront was feuding with another Berkeley gang, Five Finga Mafia, partially because Tousant Jr. may have stolen a neck chain from a Five Finga Mafia member. In a social media post, the Five Finga Mafia gave Waterfront an ultimatum to return the chain or face a violent feud. The chain was not returned. Tousant

19

believed his son was invited to a dice game under false pretenses—Nigel Blackwell, a Five Finga gang member who went by the alias "Five Finga NOC," waited in a nearby apartment for Tousant's son to leave the game before shooting him.

Before trial, Tousant moved to exclude his statements to Sanchez, arguing Sanchez failed to *Mirandize* him. The trial court heard testimony from Sanchez, viewed Sanchez's videotaped interview of Tousant and ruled Tousant's statements admissible.[8] According to the trial court, Tousant was in custody but appeared willing to talk to Sanchez about people he knew or events that occurred in Tousant Jr.'s murder case. The trial court further found Sanchez lacked any knowledge about the Berkeley shooting, lacked specifics about the firearm possession charges and limited his questioning to the circumstances of Tousant Jr.'s death. After noting that an "[i]nterrogation is a situation where the police are engaging in conduct that might reasonably be interpreted as being likely to elicit an incriminating response from somebody", the trial court observed that in the circumstances here "it would be hard" for Sanchez to elicit information about a case "he knew nothing about."

## B. The Relevant Law

The Fifth Amendment privilege against self-incrimination requires officers to inform criminal suspects, before questioning, of their right to remain silent, and that statements made may be used against them in court. (*Miranda, supra,* 384 U.S. at p. 479.) That right attaches during a custodial "interrogation." (*Ibid.*) An interrogation refers to express questioning or its functional equivalent, including "any words or actions on the part of the

_____

[8] There is no video recording or transcript of the interview in the record.

police" that the "police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-302, fn. omitted (*Innis*).) "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (*Innis,* at pp. 301-302.)

Whether an interrogation occurred is determined by "an objective test according to which we 'analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.' " (*People v. Morse* (1969) 70 Cal.2d 711, 722.) "Not every question directed by an officer to a person in custody amounts to an 'interrogation' requiring *Miranda* warnings. The standard is whether 'under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect." ' [Citation.] This is an objective standard. 'The subjective intent of the [officer] is relevant but not conclusive. [Citation.] The relationship of the question asked to the crime suspected is highly relevant. [Citation.]' " (*People v. Wader* (1993) 5 Cal.4th 610, 637.) "We review the trial court's

21

finding regarding whether interrogation occurred for substantial evidence or clear error." (*People v. Clark* (1993) 5 Cal.4th 950, 985, overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### C. Analysis

There is no dispute that Tousant was in custody when he made his statements to Sanchez. Rather, the issue is whether Tousant's statements were the product of an interrogation. (See *Innis*, *supra*, 446 U.S. at p. 300.) For the reasons set forth below, we conclude that substantial evidence supports the trial court's finding that there was no interrogation and thus no violation of *Miranda.*

### 1. *Incriminating Statements About the Berkeley Shooting*

Tousant was in custody for the August 31, 2015 firearms offense, not the Berkeley shooting, contrary to Tousant's assertions. In fact, he was not arrested for the Berkeley shooting until October 2015. Sanchez was not a Berkeley police officer; he was an Oakland officer. He did not know about the Berkeley shooting, and there was no reason for him to have believed the interview about Tousant Jr.'s murder would elicit incriminating information about the firearm possession charges for which he was in the custody of the Berkeley police. (See *People v. Dement* (2011) 53 Cal.4th 1, 26-27 [questions about unrelated offenses permissible because they could not be reasonably construed as calling for an incriminating response].)

Moreover, the trial court found Sanchez's questions were designed to elicit information about Tousant's son's murder investigation, not about any offense of which Tousant was in custody or even suspected. (See *People v. Elizalde* (2015) 61 Cal.4th 523, 537 [although not a necessary showing, "design or intent of the police is relevant to the extent it demonstrates what the police should have known about the nature of the questioning"]; *People v.*

*Wader*, *supra*, 5 Cal.4th at p. 637 [when assessing whether there was an interrogation for the purposes of *Miranda*, the " 'relationship of the question asked to the crime suspected is highly relevant' "].) The trial court further found Tousant was willing to offer Sanchez information he collected about his son's murder.

Relying on *People v. Anthony* (2019) 32 Cal.App.5th 1102 (*Anthony*), Tousant argues Sanchez should have known questioning Tousant about his son's murder would elicit incriminating information about offenses for which Tousant was being investigated. But the circumstances here are different from those in *Anthony*.

In that case, Anthony saw his fellow gang member shot and killed in Oakland. (*Anthony*, *supra,* 32 Cal.App.5th at p. 1115.) Even though he was close by, Anthony was not shot. (*Ibid.*) One month later, Berkeley police arrested Anthony, who was a suspect in the subsequent retaliatory killing of the brother of a rival Berkeley gang member. (*Id*. at pp. 1108-1109, 1112.) After his arrest, Anthony was transferred to Oakland police for questioning. (*Id*. at p. 1117.) During questioning, the Oakland police acknowledged their awareness that Anthony was a suspect in a Berkeley murder that might be gang related and possibly related to the earlier Oakland shooting. (*Id*. at pp. 1114-1116, 1124.) The Oakland officers also had reason to know about the relationship between the two cases based on Anthony's previous statements to them about his gang's feud with the Berkeley gang. (*Id*. at p. 1124.) Despite this, the officers pursued lines of questioning that called for responses bearing directly on the Anthony's motive and intent in the crime of arrest—the Berkeley shooting—and this court determined they should have provided *Miranda* warnings before questioning him further. (*Id*. at pp. 1124.)

23

Here, by contrast, Sanchez had *no* knowledge of Tousant's possible involvement in the Berkeley shooting. Nor did he have reason to know. (See *Anthony*, *supra*, 32 Cal.App.5th at p. 1124.) No one had informed Sanchez that Tousant was a suspect in that shooting. We are not persuaded by Tousant's claim Sanchez was required to ascertain all the circumstances of his August 31 arrest by Berkeley police, such as confirming Tousant was arrested in the car used by the suspects in the Berkeley shooting. Berkeley police informed Sanchez that Tousant was in custody on firearm possession charges, not charges involving a shooting. Sanchez did not ask Tousant any questions about the firearms charges, and his questions about Tousant's son's murder were not likely elicit incriminating responses bearing on those charges. Tousant cites no authority for the proposition that *Miranda* requires an officer who questions a witness about one crime must determine whether a defendant is suspected by another police department of a crime for which he has not been charged.

Nor are we persuaded by Tousant's contention that Sanchez's past statements to Tousant—discouraging him from retaliating against anyone for his son's murder—demonstrate that Sanchez knew or should have known his questions were reasonably likely to elicit an incriminating response from the Tousant. Sanchez's concern that Tousant might attempt to retaliate against the rival gang *in the future* did not require him to avoid questioning Tousant about his son's murder—a crime of which he was in no way suspected— because his answers might potentially be incriminating in an entirely different and, as far as he knew, merely potential future crime. (See *Innis*, *supra*, 446 U.S. at pp. 301-302.)

Finally, while Tousant argues that it "strains credulity" that Sanchez did not know Tousant was a suspect in the Berkeley shooting, the trial court

24

heard Sanchez's testimony and found otherwise, and we defer to its credibility determinations and factual findings.  (See *People v. Vance* (2010) 188 Cal.App.4th 1182, 1211.)

## 2. *Incriminating Statements About the Oakland Shooting*

For somewhat different reasons, we reject Tousant's additional argument, first raised on appeal, that Sanchez should have known his questioning would elicit an incriminating response regarding the Oakland shooting.[9]  Sanchez was not questioned at the hearing on the *Miranda* issue about whether he was aware of the Oakland shooting and Tousant's possible involvement.  On the record before us, he has failed to show Sanchez should have known his questions would likely elicit incriminating testimony about the Oakland shooting.

First, Tousant relies on a police bulletin prepared and distributed by Officer Arreola on August 27, 2015, to Oakland Police Department sergeants and officers and seeking assistance to identify two suspects in the Oakland shooting.  But the bulletin itself is not in the record.  Instead, any information about the bulletin is contained in secondary sources—Officer Arreola's preliminary hearing testimony and the search warrant she also prepared to search the cellphone found in the Camaro.

Although the search warrant briefly mentions the bulletin, it provides little information about it.  Arreola testified that the bulletin stated that a car was found with indicia indicating it was Tousant's car but there was no probable cause to detain Tousant.  The bulletin asked that she be notified if another officer contacted Tousant for some other reason.

---

[9] Tousant did not make that argument in the trial court in his in limine motion seeking to exclude his statements to Sanchez.  Tousant forfeited this argument by failing to raise it below, but the People do not argue forfeiture and so we shall address it.

Second, Tousant relies on the search warrant because it suggests a connection between Tousant and the Oakland shooting, and it indicates that Arreola, and therefore the entire Oakland Police Department, obtained additional significant information on August 31, 2015, the day before Sanchez interviewed Tousant. Specifically, Arreola learned that an Oakland officer had detained Tousant and two passengers that day because he was sitting in a car sought pursuant to a felony warrant relating to the Berkeley shooting investigation. As we previously described, Berkeley police searched the vehicle, yielding a handgun and a bullet casing in the rail of the driver's seat. The bullet casing was the same size as casings found at the scene of the shooting Berkeley was investigating. In the search warrant, Arreola noted that bullet casings of the same size had been found at the scene of the Oakland shooting.

Sanchez was not questioned at the suppression hearing about the bulletin, the search warrant or anything pertaining to the Oakland shooting or investigation. Nor was he questioned about anything he may have learned from Arreola beyond what was in the warrant. He testified that he may have talked to a Berkeley officer on September 1, before picking Tousant up from the jail. He learned that Tousant was in custody for a firearms offense but did not ask for details about that charge. He learned Tousant was not alone when he was stopped, but this was the only information he received.

On this record, Tousant fails to demonstrate that Sanchez knew or should have known at the time he questioned Tousant about his son's murder, that such questioning of Tousant would likely elicit incriminating

26

statements.[10]  Thus, Tousant's statements were not illegally obtained, and the trial court did not err by admitting them.[11]

## III.

### *The Trial Court Properly Admitted Evidence of Tousant's Prior Acts.*

Tousant contends the trial court abused its discretion by admitting evidence of certain prior uncharged crimes and bad acts under Evidence Code section 1101.  We find no abuse of discretion here.

### A. The Relevant Proceedings Below

The prosecutor moved to admit the evidence that in April 2015, Tousant stood outside the hospital where Tousant Jr. was brought for treatment, and while holding a firearm and ammunition, stated, "Fuck the police" and evidence that Tousant participated in the Oakland shooting.  The trial court ruled evidence of both events was admissible under Evidence Code section 1101, subdivision (b).  The trial court found the hospital incident tended to prove Tousant's motive for committing the Berkeley shooting—to exact revenge for his son's murder.  For the Oakland shooting, the trial court explained it occurred at the supposed address of the person Tousant suspected of killing his son.  This fact was probative of Tousant's intent and

---

[10]  Tousant cites *People v. Roberts* (2017) 13 Cal.App.5th 565 for the proposition that an interrogation occurs if a defendant is questioned in a way that would incriminate him in a potential future case for a crime defendant has not committed or is not known to have committed at the time.  But as Tousant acknowledges, *Roberts* involved questions about gang affiliation, and the court reasoned that "an admission of gang membership always carries with it the incriminatory prospect of future enhanced punishment."  (*Id.* at p. 576.)  Unlike admission of gang membership, statements about a crime committed by a third party against a family member or friend of the defendant do not "always carry with [them any] incriminatory prospect."

[11]  In light of this conclusion, we do not address Tousant's prejudicial error argument.

27

common plan to "find and address or deal with the people he thinks or thought might have been involved in his son's shooting."

The trial court also found admitting these acts into evidence would not result in an undue consumption of time and would not confuse the jury. After the close of evidence, the trial court instructed the jury that they "may, but are not required to, consider that evidence [of uncharged conduct] for the limited purpose of deciding whether the defendant had a motive to commit the crimes or offenses alleged in this case, or that the defendant had a plan to commit the offenses or crimes alleged in this case." It admonished the jury that the conduct could not be considered for propensity and was not sufficient on its own to support a conviction.

## B. The Relevant Law

While evidence of prior misconduct is inadmissible to prove propensity to commit a crime on a particular occasion, uncharged crimes or bad acts are admissible to prove other facts, such as "motive, opportunity, intent, preparation, [or] plan." (Evid. Code, §1101, subds. (a), (b).) Admission depends on " '(1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' " (*People v. Kelly* (2007) 42 Cal.4th 763, 783.) A jury may consider evidence of a person's conduct admitted under Evidence Code section 1101, subdivision (b) if the conduct is proven by a preponderance of the evidence. (*People v. Leon* (2015) 61 Cal.4th 569, 597.) Consistent with Evidence Code section 352, "[t]he probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of

28

misleading the jury." (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) We review trial court rulings admitting this evidence for an abuse of discretion. (*Ibid*.)

**C. Analysis**

### 1. *Tousant's Conduct Outside the Hospital*

There was no abuse of discretion in admitting Tousant's statements and actions outside the hospital, which were highly probative of his motive to commit the Berkeley shooting. (See *People v. Thompson* (2016) 1 Cal.5th 1043, 1114 [uncharged conduct may be relevant to establishing motive if there is a direct relationship between the uncharged conduct and an element of the charged offense].) While motive is not an element of Tousant's offenses, it is "an intermediate fact" probative of his intent. (*Ibid*.) Tousant's possession of a shotgun and his statement, "Fuck the police" while standing outside the hospital where Tousant Jr. died tended to establish a motive to retaliate for his son's death instead of relying on police and prosecutors to bring the killer to justice. Although Tousant did not know who killed his son when he engaged in this conduct, the victims of the Berkeley shooting included a suspected member of the Five Finga Mafia, the group Tousant *later* believed was responsible for his son's murder. That the gun Tousant held while standing outside the hospital was different from the gun used in the Berkeley shooting does not render this evidence inadmissible. "[E]vidence of weapons unconnected to the crime may be relevant for other purposes" (*People v. Merriman* (2014) 60 Cal. 4th 1, 81), such as motive, which " 'is not dependent on comparison and weighing of the similar and dissimilar characteristics of the past and present crimes.' " (*Thompson*, *supra*, 1 Cal.5th at p. 1114.)

Furthermore, the court reasonably concluded admitting this evidence was not unduly prejudicial. (See *People v. Kipp*, *supra*, 18 Cal.4th at p. 371.) To the extent Tousant contends this evidence allowed him to be characterized

29

as a "gun-toting criminal," it was simply cumulative of other evidence admitted at trial that Tousant possessed guns (e.g., photo showing Tousant with two handguns and holding an assault rifle).  (See *People v. Gunder* (2007) 151 Cal.App.4th 412, 417 ["evidence demonstrat[ing] criminal propensity is simply a factor to consider in assessing the prejudice from its admission; it is not a basis for exclusion unless the evidence otherwise lacks any probative value"].)  We also presume the jury, as instructed, only considered this incident for the limited purpose of establishing Tousant's motive to commit his charged offenses, not his propensity to carry firearms.  (See *People v. Holt* (1997) 15 Cal.4th 619, 662 ["[j]urors are presumed to understand and follow the court's instructions"].)  Admitting this evidence was not an abuse of discretion.

### 2. *The Oakland Shooting*

Similarly, the court properly found the Oakland shooting evidence probative of Tousant's common plan to find and harm people he believed to have killed his son.  "[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).)  To prove the existence of a common design or plan, there must be a "greater degree of similarity" between the uncharged act and charged offense.  (*Id.* at p. 402 [the least degree of similarity is required to establish intent, and the greatest degree of similarity is required to establish identity].)  The "common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 383.)

The Oakland and Berkeley shootings shared a requisite level of common features. Both incidents involved shooting at victims whom Tousant *believed* to be members of the Five Finga Mafia—Kevin Greene and Nigel Blackwell. Text messages on Tousant's cellphone evidenced his belief Nigel Blackwell lived at 1314 105th Avenue, the address of the Oakland shooting. Kevin Greene was a victim in the Berkeley shooting, which occurred near San Pablo Park, an area where the Five Finga Mafia was known to operate. The shootings occurred only five days apart and were executed by firing multiple shots at the supposed targets. 7.62 by 39-millimeter ammunition or casings—like the bullet found in Tousant's car during the August 31 traffic stop—were recovered from the scenes of both shootings.

Tousant argues the Oakland shooting was insufficiently similar to the Berkeley shooting to be admissible. Primarily, he claims the suspects' descriptions and the car allegedly used in the Oakland shooting—an older four-door vehicle—do not match him or his car. But greater similarity between the uncharged conduct and charged offense is required for demonstrating identity, not the existence of a common plan. (See *Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.) The manner in which the shootings were executed, the short timeframe between the two crimes, and the fact that the intended victims were affiliated with the same gang demonstrate a degree of similarity sufficient to support an inference that Tousant acted according to a common plan to retaliate against his son's alleged killers. (Cf. *People v. Grant* (2003) 113 Cal.App.4th 579, 589 [taking similar types of items, computer equipment, from similar places, empty schools after hours, by prying open doors or windows was not sufficiently similar to demonstrate common plan particularly where burglaries occurred three years apart].)

31

We also disagree that the evidence failed to establish Tousant's involvement in the Oakland shooting, thus rendering this evidence unduly prejudicial. Tousant's Camaro was parked across the street from the shooting, his text messages and internet searches identified the address of the shooting—a preponderance of the evidence established that Tousant was at the scene of and involved in the Oakland shooting. (See *People v. Leon*, *supra*, 61 Cal.4th at p. 597.) The trial court's instructions to the jury that an uncharged offense does not sufficiently support a conviction of the charged offense—here, the Berkeley shooting—on its own mitigated any prejudicial effect of admitting the Oakland shooting evidence. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405 [noting "jury might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses"].) The trial court did not abuse its discretion by admitting evidence of the Oakland shooting.

Finally, we reject Tousant's additional claim that admission of these prior acts violated his constitutional rights. The " ' "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." ' " (*People v. Mills* (2010) 48 Cal.4th 158, 194.)

## IV.

### *The Trial Court Properly Denied Tousant's Motion to Sever His Offenses.*

Tousant argues the trial court erroneously denied his request to sever his Berkeley assault charges from his Oakland firearm possession charges. He claims his offenses did not meet the statutory criteria for joinder under section 954, and the trial court abused its discretion by allowing a weak case to be bolstered by his stronger Oakland firearm possession case. There was no error or abuse of discretion in the trial court's ruling.

**A. The Relevant Law**

Two or more different offenses "connected together in their commission" or "of the same class of crimes or offenses" may be charged and tried together in one case.  (§ 954.)  A court may further consolidate to one or more accusatory pleadings if "filed . . . in the same court."  (*Id*.)  " 'Offenses of the same class are offenses which possess common characteristics or attributes.' " (*People v. Landry* (2016) 2 Cal.5th 52, 76 [possession of a weapon while in custody and assault by a life prisoner share common characteristics of offenses in custodial context and prison-made weapons and served same purpose of preventing assault by armed prisoners]; cf. *People v. Madden* (1988) 206 Cal.App.3d Supp.14, 19 [charges of possession of hypodermic needle and failure to appear have no common characteristics or attributes].)

Courts may sever properly joined offenses "in the interests of justice and for good cause shown," but there is a preference for joinder in the interests of judicial economy and efficiency.  (§ 954; *People v. Simon* (2016) 1 Cal.5th 98, 122.)  If the statutory requirements for joinder are satisfied, a defendant establishes an abuse of discretion denying severance "only on a clear showing of prejudice."  (*People v. Lucky* (1988) 45 Cal.3d 259*,* 277.) "Refusal to sever may be an abuse of discretion where:  (1) evidence of the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case."  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 282.)  The potential prejudice from the joint trial is then

balanced against the benefits to the state. (*People v. Soper* (2009) 45 Cal.4th 759, 775 (*Soper*).)

### B. Analysis

The statutory requirements for joinder were satisfied here. Both of Tousant's criminal complaints charged him with felon in possession of a firearm—counts 8 and 11. (§ 29800, subd. (a)(1).) Those and Tousant's other firearms charges—felon carrying a concealed, loaded, unregistered firearm in a vehicle (§§ 25400, subds. (a)(1), (c)(1), (c)(6)), felon carrying a loaded, unregistered firearm in a city (§§ 25850, subds. (a), (c)(1), (c)(6))—and the Berkeley assault with firearm charges are in the same class because they all involve the illegal use of firearms.[12] To the extent Tousant argues the statutes for assault and firearm charges are in different parts of the Penal Code and thus not in the "same class," we disagree. The statute does not mandate any such requirement. (See *People v. Landry*, *supra*, 2 Cal.5th at p. 76.)

Nor did the trial court abuse its discretion by rejecting Tousant's motion to sever the joined offenses. Tousant concedes most evidence from the Oakland traffic stop would be cross-admissible in a separate trial for the Berkeley shooting. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1154 [cross-admissibility alone sufficiently dispels any prejudice].) First, Tousant was

---

[12] Various cases explain the legislative purpose behind these firearm statutes. (See, e.g., *People v. Bedolla* (2018) 28 Cal.App.5th 535, 552 [purpose of § 25850, subd. (a) to address the hazard presented by carrying loaded firearms in public]; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1409 [legislative intent of § 12021, now § 29800, to " ' "limit as far as possible the use of instruments commonly associated with criminal activity" ' " and presumption " 'the danger is greater when the person possessing the concealable firearm has previously been convicted of felony' "]; *People v. Martinez* (1987) 194 Cal.App.3d 15, 20 [noting Legislature instituted specific punishment for assaults committed with firearms in § 245].)

arrested for his August 31 firearm possession offenses in the same car used during the Berkeley shooting, the white Chevrolet Impala. Indeed, police initiated the stop because they sought the Impala in relation to a serious crime. Second, a search of the Impala during the traffic stop yielded a 7.62 by 39-caliber bullet, the type of bullet used in the Berkeley shooting. Tousant nonetheless argues the 9-millimeter handgun found in his car during the Oakland traffic stop would not be independently admissible in a separate trial for the Berkeley shooting. Even assuming we agree, that fact does not conclusively establish prejudice. (*Soper*, *supra*, 45 Cal.4th at p. 775 [in the absence of cross admissibility, courts proceed to consider the other factors for assessing "spill-over" effect].)

The additional section 954 factors support the trial court's order. Tousant does not contend the charges are likely to unusually inflame the jury or that any of the charges are capital offenses. (See *People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 282.) Instead, he claims joinder impermissibly bolstered a weak case—the Berkeley shooting—with a strong one—the Oakland firearm possession. Although the evidence supporting Tousant's Berkeley assault offense is circumstantial, the evidence for both charges is strong. Tousant's text messages, cellphone tower records establishing Tousant's location during the shooting, and his possession of the same car and bullets used in the Berkeley shooting tended to prove he committed the Berkeley assault. (See *Soper*, *supra*, 45 Cal.4th at p. 781 ["A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect' "].) On balance, Tousant cannot demonstrate any prejudice outweighed the benefits of joinder. (See *id*. at p. 782 [severance of joined charges denies state benefits of efficiency and conservation of resources].)

35

We reject Tousant's further claim that joining his offenses in a single trial was so grossly unfair as to violate his due process rights. While we "still must determine whether, in the end, the joinder of counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law," nothing in the record supports his assertion. (*People v. Rogers* (2006) 39 Cal.4th 826, 851.) In addition to rehashing his arguments regarding prejudice that we have already rejected, Tousant claims joinder allowed the prosecutor to impermissibly argue the handgun obtained from the Oakland traffic stop was used in the Berkeley shooting. But the prosecutor expressly informed the jury that that gun was *not* used in the Berkeley shooting. Tousant further complains the jury was not instructed that evidence for one charge may not be considered when determining his guilt for another charge. However, there is no requirement that the trial court provide such instruction, and the trial court *did* instruct the jury with CALCRIM No. 3515, "Multiple Counts: Separate Offenses (Pen. Code, § 954)," stating "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." (See CALCRIM No. 3515; *People v. Geier* (2007) 41 Cal.4th 555, 578-579.) Having concluded Tousant did not suffer any prejudice from his joint trial, we may also "reject his contention that the joint trial violated his due process rights." (*People v. Sapp* (2003) 31 Cal.4th 240, 259–260.)

## V.

### *Substantial Evidence Supports Tousant's Assault Convictions.*

Tousant argues there was insufficient evidence to support his conviction of three counts of assault with firearm (§ 245, subd. (a)(2) (counts 2-4)). Tousant concedes bullets were fired at 2806 Mabel Street. But he claims there was insufficient evidence that David Conerly, Kevin Greene,

36

and Jocko Milan were standing close enough to the house, and thus the bullets, to establish that they were victims of the assault. We are unpersuaded.

## A. The Relevant Law

Challenges to the sufficiency of the evidence supporting a conviction requires reviewing the entire record in the light most favorable to the judgment to assess whether it contains substantial evidence—" 'evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Golde* (2008) 163 Cal.App.4th 101, 108.) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.) When reviewing the sufficiency of the evidence, we do not resolve any credibility issues or evidentiary conflicts. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Instead, we presume "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Section 245, subdivision (a)(2) provides: "Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment . . . ." Assault "requires only a general criminal intent and not a specific intent to cause injury." (*People v. Williams* (2001) 26 Cal.4th 779, 782.) The defendant must have "(1) willfully committed an act which by its nature would probably and directly result in the application of physical force against another and (2) was aware of facts that would lead a reasonable person to realize this direct and probable consequence of his or her act." (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186.) A defendant may be convicted of multiple counts of assault when shooting into a group of

37

people.  (See, e.g., *People v. Riva* (2003) 112 Cal.App.4th 981, 999 ["when the defendant shoots into a group of persons primarily targeting only one of them, the defendant can be convicted of assault with a deadly weapon as to the nontargeted members of the group"].)

**B. Analysis**

There was substantial evidence the shots were fired into the group consisting of Conerly, Greene, and Milan,[13] thus supporting a finding all three were victims of assault.  The shots fired from the Impala focused on the area of 2806 Mabel Street—a bullet shattered one of the windows, and the driveway and front stairs of the house were riddled with bullet holes. Accounts from several witnesses established Conerly, Greene, and Milan were just outside 2806 Mabel Street before the shooting occurred.  Mario Thomas, a witness, told police that he was hanging out at that house with Milan, Conerly, and Greene shortly before the shooting.  He crossed the street to his car and, while there, saw the Impala stop "near" where Conerly, Greene, and Milan were still hanging out.  He then heard 10 to 12 shots fired, causing him to fall to the ground under his car.  Based on the evidence that the Impala pulled up near where Conerly, Greene, and Milan remained shortly after Thomas crossed the street, and the shots were fired from the Impala towards the house where the three were hanging out, the jury could reasonably infer Greene, Conerly, and Milan were in an area likely to be hit by a bullet.

Tousant's claim that a pre-trial statement by Greene noting that he was with his friend at San Pablo Park before the shooting and implying he

---

[13] Rashad Jacob, who was also part of this group, was shot, and Tousant does not contest the sufficiency of the evidence supporting his conviction of assault against that victim.

was not within the line of fire, does not change this result. (See *People v. Zamudio*, *supra*, 43 Cal. 4th at p. 357 [" 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' "].) Tousant's additional argument that Greene, Conerly, and Milan were only "near" the Impala and thus not sufficiently close to the line of fire is no more successful. The shots were fired over a large area where the three men congregated—officers collected bullet shells from both 2806 and 2810 Mabel Street, the neighboring house. And although specific intent to target a person is not required to support a conviction for assault, 10 to 15 shots were fired directly at one of the men who tried to run down the street and hid behind a bystander's car. (See *People v. Aznavoleh*, *supra*, 210 Cal.App.4th at pp. 1186-1187; cf. *People v. Medina* (2019) 33 Cal.App.5th 146, 153 [for attempted murder conviction, substantial evidence victims were in the line of fire where defendant pointed and fired gun at one victim, and other victims were 5 to 20 feet away from where defendant was shooting].) The evidence supports Tousant's assault convictions.

## VI.

### *The Trial Court Properly Responded to a Jury Question.*

Tousant argues the trial court failed to adequately respond to a jury question seeking clarification about the date of the conduct supporting his August 15 firearm possession charge—the same day as the Berkeley shooting. This claim fails.

The trial court instructed the jury on the elements for unlawful possession of a firearm in violation of section 29800, subdivision (a)(1). For count 8, the verdict form required the jury to determine whether Tousant

39

unlawfully possessed a firearm "on or about August 15, 2015." During deliberations, the jury asked the court: "With regards to Count #8 [possession of a firearm], what does the phrase 'on or about August 15' mean? Does this mean before/after the 15th? Does it mean April? How flexible is this phrase?" After conferring with counsel, the court responded, "With respect to count 8, the phrase 'on or about August 15' concerns evidence that was presented relative to conduct alleged to have occurred on that [*sic*]. [¶] If this [does] not adequately answer your question, please let me know." Jurors remained confused and again asked for clarification. The court and counsel conferred again, and the court responded, "In this particular case . . . [i]t's August 15."

Rather than identifying an error in this response, Tousant argues the trial court did not adequately clarify that count 8 related to his conduct on August 15, 2015. This is unconvincing. Section 1138 requires trial courts "to provide the jury with information the jury desire[s] on points of law" during deliberations. (*People v. Smithey* (1999) 20 Cal.4th 936, 985 (*Smithey*); § 1138.) "Where the original instructions themselves are full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The court must "rectify any confusion expressed by the jury regarding instructions, but has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Smithey*, at p. 1009.)

Initially, Tousant forfeited this challenge because the court responded after consulting with Tousant's trial counsel. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1048 [party forfeits objection to "court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that

40

response"].)  Even assuming Tousant preserved the issue for our review, the court's response was not an abuse of discretion.  (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1016 [standard of review for claimed errors under section 1138].)  Count 8, Tousant's firearm possession charge related to his conduct on August 15, 2015, the day of the Berkeley shooting.  (§ 29800, subd. (a)(1) (count 8)).  Upon request, the trial court clearly identified the date of conduct supporting this charge, August 15.  This was the correct response, and Tousant does not identify any additional information that was necessary to address the jury's confusion.  There was no abuse of discretion.

## VII.

### *Tousant Does Not Establish Ineffective Assistance of Counsel.*

Tousant broadly asserts he received ineffective assistance of counsel for any objections we find inadequately preserved in the trial court, and thus forfeited on appeal.  This generic argument fails to satisfy the heavy burden to prevail on an ineffective assistance of counsel claim on appeal.

For that, a defendant must show (1) trial counsel's performance was deficient, falling below an objective standard of reasonableness when measured by prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.)  It is "particularly difficult to prevail on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more

41

appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Relevant here, Tousant forfeited his challenges to the court's response to a jury question and the breadth of information permitted by the search warrant of his cellphone. But Tousant simply states "there was no conceivable tactical reason not to object to the errors described above." There is no indication in the record why counsel did not object to either issue and there may be satisfactory explanations for both. For the trial court's response to the jury, trial counsel may have believed the court corrected any misconceptions about Tousant's charged firearm offense. As for the objection to the search warrant, trial counsel may have believed it would be futile to object to the breadth of the information sought by the search warrant. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].) Where the record is silent on these points, Tousant's ineffective assistance claim is "more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

## VIII.

### *There Was No Cumulative Error.*

Tousant contends the cumulative effect of his identified errors warrant reversal of the judgment. We have not identified any errors, individual or cumulative, and reversal is not required. (*People v. Coryell* (2003) 110 Cal.App.4th 1299, 1309.)

### DISPOSITION

The judgment is affirmed.

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

*People v. Tousant* (A156044)

43

Trial Court:Alameda County Superior Court

Trial Judge:       Hon. Kevin R. Murphy

Counsel:

James S. Donnelly-Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share, Leif M. Dautch and Rene A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.